535 A.2d 231

City of Philadelphia, et al., Appellants *v.* District Council 33 and Earl Stout, Appellees.

Argued September 16, 1987, before Judges CRAIG, MACPHAIL, BARRY, COLINS and PALLADINO.

*Ralph J. Teti,* Chief Deputy City Solicitor, with him, *Jesse Milan, Jr.,* for appellants.

*Richard A. Sprague,* with him, *Philip I. Weinberg, Randi J. Vladimer, Leslie M. Thoman, Sprague, Higgins & Creamer,* for appellees.

OPINION BY JUDGE CRAIG, December 18, 1987:

The City of Philadelphia appeals an order of the Court of Common Pleas of Philadelphia County preliminarily enjoining the city from enforcing Philadelphia Ordinance 1107 of January 8, 1987. That ordinance

purported to establish a pension plan for city employees hired after January 1, 1987, different from the plan provided in the collective bargaining agreement in effect between the city and District Council 33 of the American Federation of State, County and Municipal Employees, AFL-CIO (union), the exclusive bargaining representative for most of the city's civil service employees.

District Council 33 and Earl Stout, its president, filed a verified complaint in equity seeking (1) preliminary and permanent injunctions against the enforcement of Ordinance 1107, and (2) a declaration that enforcement of the ordinance would constitute a breach of the collective bargaining agreement between the union and the city, and that the ordinance is unconstitutional in that it violates article I, §17 of the Constitution of the Commonwealth of Pennsylvania, and article I, §10 of the Constitution of the United States, the state and federal "Contracts Clauses," which forbid the enacting of laws impairing the obligations of contract.

The issues raised on this appeal are (1) whether jurisdiction over this dispute properly lay in the court of common pleas or in the Pennsylvania Labor Relations Board when the union alleged a breach of contract accomplished by means of an assertedly unconstitutional ordinance, and (2) if jurisdiction in the court was proper, whether the order granting the preliminary injunction was supportable by any apparently reasonable grounds in the light of the standards established in case law for the granting of such relief.[1]

---

[1] As appellees point out, issues argued in appellants' brief relating to the standing of the union to attack some provisions of Ordinance 1107 as an increase in benefits for elected officials contrary to statute and to the alleged violation of a municipal ordinance in the procedures under which Ordinance 1107 was adopted are not properly before this court because the trial court did not con-

## 1. History

The facts, as found by Judge MAIER in his opinion for the common pleas court, are as follows.

On July 22, 1986, after negotiations, District Council 33 and the City of Philadelphia reached a collective bargaining agreement, which was memorialized in a "Memorandum of Understanding." That memorandum continued in effect the provisions of the previous collective bargaining agreement, including the pension and retirement provisions of the Municipal Retirement System as then amended, commonly known as "Plan J," for the period from July 1, 1986, through June 30, 1988. The agreement provides that all persons hired during the term of the contract and falling within District Council 33's representation are entitled to benefits in accordance with the contract as ratified by the memorandum.

In December of 1984 the legislature enacted the Municipal Pension Plan Funding Standard and Recovery Act (Act 205).[2] Chapter 2 of Act 205 contains mandatory provisions, applicable to all municipalities that maintain pension plans for their employees, relating to the filing of actuarial valuation reports and experience investigations. Chapter 3 mandates minimum funding standards for the various kinds of municipal pension plans.

Chapters 5 and 6 of Act 205 relate to financially distressed municipal pension plans. Chapter 5 establishes the procedures by which municipalities wishing to avail themselves of the act's special relief provisions shall have the financially distressed condition of their pension

---

sider them in exercising his discretion to grant the preliminary injunction, and the propriety of that exercise of discretion is the only issue currently on appeal.

[2] Act of December 18, 1984, P.L. 1005, *as amended*, §§101-803, 53 P.S. §§895.101-895.803.

plans determined by the Public Employee Retirement Study Commission. Depending on the degree of financial distress, municipalities may participate in one of three levels of the recovery program established in Chapter 6, if they elect to do so.

The City of Philadelphia sought an evaluation of the financial condition of its pension plan. The Retirement Study Commission determined that the city's plan was "severely distressed" (the worst rating); the city therefore was entitled to participate in Level III of the recovery program, as provided in section 606[3] of the Act. The city elected to participate in Level III.

Participation by a municipality in the recovery program both affords financial and other benefits to the municipality and imposes obligations upon it that are designed to aid in restoring the actuarial health of the pension plan. Among the mandatory remedies required of Level III participants is "[t]he establishment of a revised benefit plan for newly hired municipal employees pursuant to section 607(e)." Section 606(b)(2).[4]

Section 607(e)[5] provides in part:

> **(e) Establishment of a revised benefit plan for newly hired municipal employees.**—The municipality may establish a revised benefit plan of the pension plan applicable to any employee first hired on or after the effective date of the instrument establishing the revised benefit plan. . . . Member contributions with respect to the revised benefit plan of the pension plan shall at a minimum be equal to or exceed 30% and at a maximum not to exceed 50%, of the normal cost of the pension plan, expressed as a percentage of covered payroll, as reported in the most recent

---

[3] 53 P.S. §895.606.
[4] 53 P.S. §895.606(b)(2).
[5] 53 P.S. §895.607(e).

actuarial valuation report of the pension plan. A revised benefit plan for newly hired municipal employees shall be developed with consultation with representatives of the collective bargaining unit applicable to the affected type of municipal employee, if any, and shall be within the scope of collective bargaining pursuant to the applicable law subsequent to the establishment of the revised benefit plan.

Section 607 also provides that, "[n]otwithstanding any provision of law, municipal charter, municipal ordinance, municipal resolution, or pension plan agreement, document or instrument to the contrary, the remedies specified in this section shall be available to the applicable municipalities." Section 607(a).[6]

Ordinance 1107, passed on January 8, 1987, over the mayor's veto, was designed to meet the requirements of section 607(e) of Act 205. The new pension plan, commonly known as "Plan 87," incorporated many changes from the Plan J provisions in effect under the collective bargaining agreement. Among those changes were increased eligibility requirements, change in the benefit calculation formula resulting in a reduction of benefits, and elimination of service-connected disability benefits.

On January 14, 1987, District Council 33 filed its complaint in equity asserting, among other things, that Ordinance 1107 unilaterally changed and abrogated the pension provisions of the collective bargaining agreement and that it was a unilateral decision of the city impairing the obligations of contract in violation of the contracts clauses of the state and federal constitutions. The complaint sought the injunctive and declaratory relief outlined above. On the same date the union filed a motion for preliminary injunction.

---

[6] 53 P.S. §895.607(a).

Subsequent to the hearing, Judge MAIER of the Court of Common Pleas of Philadelphia County issued an order on March 6, 1987, (1) preliminarily enjoining the city from enforcing Ordinance 1107 as it pertained to the members of District Council 33 (the injunction to terminate at midnight on June 30, 1988—the time of the expiration of the collective bargaining agreement), (2) maintaining jurisdiction over the matter until June 30, 1988, or until a full hearing on the permanent injunction or other resolution of the underlying action, (3) stating that the injunction might be dissolved upon a showing by the city that the continued enforcement of the injunction would be more harmful than dissolution, and (4) requiring the union to post a bond of $15,000. The city timely appealed from that order.

## 2.  *Jurisdiction*

As a threshold matter, we must examine the city's contention that jurisdiction over this dispute lay exclusively in the Pennsylvania Labor Relations Board (PLRB) and not in the court of common pleas. Section 1301 of the Public Employe Relations Act (PERA)[7] provides as follows:

> The [PLRB] is empowered, as hereinafter provided, to prevent any unfair practice listed in Article XII of this act. This power shall be exclusive and shall not be affected by any other means of adjustment or prevention that have been or may be established by agreement, law, or otherwise.

Among the unfair labor practices enumerated in Article XII is that set forth in section 1201(a)(5):[8]

---

[7] Act of July 23, 1970, P.L. 563, §1301, 43 P.S. §1101.1301.
[8] 43 P.S. §1101.1201(a)(5).

Refusing to bargain collectively in good faith with an employe representative which is the exclusive representative of employes in an appropriate unit, including but not limited to the discussing of grievances with the exclusive representative.

The city asserts that the union's complaint alleges in effect that the city has failed to bargain collectively with regard to the creation of the new pension plan, that is, that the city has committed an unfair labor practice. The city further notes that the Pennsylvania Supreme Court has construed broadly the section 1301 grant of exclusive jurisdiction to the PLRB to decide unfair labor practices:

Thus, if a party directly seeks redress of conduct which arguably constitutes one of the unfair labor practices listed in Article XII (Section 1201) of the PERA, . . . jurisdiction to determine whether an unfair labor practice has indeed occurred and, if so, to prevent a party from continuing the practice is in the PLRB, and nowhere else.

*Hollinger v. Department of Public Welfare*, 469 Pa. 358, 366, 365 A.2d 1245, 1249 (1976). Therefore, the city argues, jurisdiction over this dispute lay solely in the PLRB.

This argument is appealing on its face, but it is fundamentally in error. The argument mischaracterizes the content of the union's pleadings. Although the union refers to the enactment of Ordinance 1107 as a unilateral act by the city, the allegations of the complaint are directed toward the effect of the ordinance on the existing contract, not toward the manner in which the ordinance was developed and became effective.

In *Hollinger* the Supreme Court noted the following, albeit in dictum, with regard to the rule that where the remedy sought is a redress of an unfair labor practice

then the PLRB is vested with exclusive original juris-
diction under section 1301 of PERA:

> This rule does not, of course, divest a court of
> jurisdiction to entertain suits for *breach of con-
> tract* merely because the alleged breach may ar-
> guably be an unfair labor practice. See Building
> Service Employees International Union, Local
> 252 v. Schlesinger, 440 Pa. 443, 452 n. 3, 269
> A.2d 894, 896 (1970). See also Vaca v. Siper
> [sic], 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d
> 842 (1967); Humphry [sic] v. Moore, 375 U.S.
> 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1966); Carey
> v. Westinghouse Electric Corp., 375 U.S. 261,
> 84 S.Ct. 401, 11 L.Ed.2d 320 (1964).

*Hollinger,* 469 Pa. at 365 n. 10, 365 A.2d at 1249 n. 10
(emphasis in the original).[9]

It is our view that this case falls within the exception
noted in *Hollinger.* The union asserts here that the city's
conduct in enacting Ordinance 1107 constitutes a
breach of contract. Although the city did not bargain
over the creation of the new pension plan, the union's
claim is not addressed to that failure to bargain, and the
union does not seek an order compelling bargaining as
relief.      Rather, the union's position is that the city *al-
ready has bargained* on the subject of pensions, and the
fruits of that bargaining are incorporated in a presently
effective, valid contract. The gravamen of the union's

------

[9] This case presents no problem of standing to sue such as was
present in *Ziccardi v. Commonwealth,* 50 Pa. Commonwealth Ct.
367, 413 A.2d 9 (1980), where we noted that the *Hollinger* dictum
was not applicable because the individual employee lacked standing
to sue the employer on the contract formed pursuant to collective
bargaining. Here it is the collective bargaining representative, one
of the parties to the contract, that is suing the other party, the
employer. Obviously the union has standing to seek to enforce a
contract to which it is a party.

complaint is that the city, by substituting a new pension plan for the bargain-for plan incorporated in the existing collective bargaining agreement, simply has breached the contract. Act 205 may or may not provide the city with an adequate defense to this charge of breach of contract, but the fact remains that the nature of the union's claim is an action to enforce the contract, not an action under PERA for failure to bargain.

The situation presented here is no different from a hypothetical case in which a municipality, party to a binding collective bargaining agreement with the representative of its employees, began paying its employees at half the rates established in the contract. The union would have no interest in obtaining an order from the PLRB compelling the employer to bargain for a new wage scale. Rather, the union would sue in court to enforce the terms of the existing contract. If the union had notice of the municipality's intention to lower wages before the first reduced paychecks went out, then the union would sue in equity to prevent such action.

*City of Allentown v. Local 302, International Association of Fire Fighters,* 511 Pa. 275, 512 A.2d 1175 (1986), involved a situation very similar to the present case. There a city passed an ordinance pursuant to which all firefighters hired after a certain date were ineligible for membership in the city's pension fund and were required to participate in the statewide retirement system established under Pennsylvania municipal retirement law. The firefighters were covered by a collective bargaining agreement established pursuant to the Act of June 24, 1968, P.L. 237, 43 P.S. §§217.1-217.10, which agreement included by reference the provisions of the existing municipal pension plan. Although it appears that no one argued in that case that the dispute might be an unfair labor practice within the exclusive jurisdiction of the PLRB, the Supreme Court held that

"[t]he unilateral decision by the City to initiate new pension terms for some members of the bargaining unit constituted a breach of the collective bargaining agreement." 511 Pa. at 287, 512 A.2d at 1181 (footnote omitted). The court remanded to the court of common pleas for the determination of an appropriate remedy for the breach of contract.[10]

We note further that the asserted breach of contract was accomplished by the city's enacting an ordinance that the union contends is unconstitutional, and part of the relief sought by the union is a declaration to that effect. Although the PLRB has exclusive original jurisdiction to determine unfair labor practices, no one contends that the board has the power to determine the constitutionality of municipal ordinances. For the foregoing reasons, we hold that jurisdiction over this action properly lay in the court of common pleas.

### 3. Preliminary Injunction

The standard for granting a preliminary injunction under Pennsylvania law is as follows:

---

[10] Compare Professional and Public Service Employees Union Local 1300 v. Trinisewski, 94 Pa. Commonwealth Ct. 462, 504 A.2d 391 (1986), where, in a case under PERA, a union sought to have a court of common pleas enforce certain collective bargaining agreements, and the public employer defended on the grounds that the union lacked capacity to enter into those agreements because the union had not been certified by the PLRB. When the union argued on appeal that the employer's allegations of lack of capacity really constituted an unfair labor practice charge within the exclusive jurisdiction of the PLRB under section 1301 of PERA, this court held that where the common pleas court was called on to enforce the agreements, "[t]he validity of the agreements and the capacity of the parties to enter into them are not issues which the Common Pleas Court is precluded from considering by PERA. The Common Pleas Court had the jurisdiction to rule as it did." 94 Pa. Commonwealth Ct. at 468, 504 A.2d at 394.

'[F]irst, that it is necessary to prevent immediate and irreparable harm which could not be compensated by damages; second, that greater injury would result by refusing it than by granting it; and third, that it properly restores the parties to their status as it existed immediately prior to the alleged wrongful conduct. . . . Even more essential, however, is the determination that the activity sought to be restrained is actionable, and that the injunction issued is reasonably suited to abate such activity. And unless the plaintiff's right is clear and the wrong is manifest, a preliminary injunction will not generally be awarded . . . .'

*New Castle Orthopedic Associates v. Burns,* 481 Pa. 460, 464, 392 A.2d 1383, 1385 (1978) (quoting *John G. Bryant Co., Inc. v. Sling Testing & Repair, Inc.,* 471 Pa. 1, 7, 369 A.2d 1164, 1167 (1977)), (citations omitted). In addition, where an adverse effect upon the public interest will result from the granting of a preliminary injunction, it should not be granted. *McMullan v. Wohlgemuth,* 444 Pa. 563, 572, 281 A.2d 836, 841 (1971).

The standard of review on appeal from the grant or denial of a preliminary injunction also is well established:

'[O]n an appeal from the grant or denial of a preliminary injunction, we do not inquire into the merits of the controversy, but only examine the record to determine if there were any apparently reasonable grounds for the action of the court below. Only if it is plain that no grounds exist to support the decree or that the rule of law relied upon was palpably erroneous or misapplied will we interfere with the decision of the Chancellor.'

*Mazzie v. Commonwealth,* 495 Pa. 128, 133, 432 A.2d 985, 988 (1981) (quoting *Roberts v. Board of Directors*

*of School District of Scranton,* 462 Pa. 464, 469, 341 A.2d 475, 478 (1975)). In the rare case where preliminary injunctive relief is affirmative, a reviewing court will engage in closer scrutiny and will insist that a clear right to relief in the plaintiff be established. However, where the preliminary injunction is merely prohibitory, that is, where it enjoins the doing of an act that will change the status quo, the "apparently reasonable grounds for the action" standard should be applied. Because the preliminary injunction at issue here is prohibitory—it prevents enforcement of Ordinance 1107 and preserves the status quo before the ordinance took effect—we will review the grant of the injunction under the apparently reasonable grounds standard.

On the issue of immediate and irreparable harm that could not be compensated by damages, Judge MAIER determined that the testimony and physical evidence presented to him had demonstrated that Plan 87 constituted a diminution in benefits to members of the union as compared to Plan J. Based on this showing, the judge inferred that the enforcement of such a unilateral and detrimental change in benefits during the life of the contract would result in a future permanent membership loss to the union. Because the judge considered the city's allegations of hardship to be unproved, as discussed below, he concluded that enforcement of the Plan 87 provisions based solely upon such unproved allegations would be likely to impair the union's ability to maintain its existing membership and to attract new members and would jeopardize the union's ability to enforce the wage and other benefits provisions of this and other contracts. Although the judge's conclusion of irreparable harm was based primarily on inference, we cannot conclude that it was supported by no apparently reasonable basis.

The issue of whether greater injury would result from refusing rather than granting the injunction

merges, in this case, with the issue of possible adverse effect on the public interest, and it will be discussed below.

The third element listed in *New Castle Orthopedic Associates* is that the requested injunction properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct. The order issued by Judge MAIER was tailored carefully to accomplish just that result. The Plan J pension provisions incorporated in the present contract will remain in effect, and enforcement of the Plan 87 provisions, contained in the allegedly wrongful Ordinance 1107, will be prevented pending a determination of the request for a permanent injunction or other resolution of the underlying dispute.

As to the element of the likelihood of success on the merits, Judge MAIER expressed his view that, under cases such as *City of Allentown v. Local 320, International Association of Fire Fighters*, it was likely that the city's action in establishing a new pension plan by means of Ordinance 1107 would be held to be a violation of the Pennsylvania and United States Constitutions.

Article I, §17 of the Constitution of the Commonwealth of Pennsylvania provides as follows:

> No ex post facto law, nor any law impairing the obligation of contracts, or making irrevocable any grant of special privileges or immunities, shall be passed.

In the present case, the terms of the Plan J pension plan are incorporated in the current collective bargaining agreement. There is no dispute that the Plan 87 provisions of Ordinance 1107 constitute a substantial change from the existing contract pension provisions, as they were intended to do. The city's contention is that this case is different from *City of Allentown* because Act 205 expressly authorizes the city to enact such a change.

The city's contention that Act 205 of its own effect *mandates* that the city adopt a new pension plan is erroneous because, although the Act does mandate the adoption of a new plan for Level III participants in the recovery program, participation in that program is *elective. See* section 602(d).[11]

The union does not attack the constitutionality of Act 205 on its face, but rather asserts that it would be unconstitutional if it were interpreted in the manner urged by the city. The union offers an interpretation of section 607(e) of Act 205 that would require the city to bargain before implementing any new pension system and so, the union contends, render the act constitutional. Regardless of which interpretation of Act 205 ultimately is adopted, the union contends that Ordinance 1107, which impairs the city's obligations under its present contract, is unconstitutional.

We agree with Judge MAIER that the union is likely to succeed on the merits. In *City of Allentown* the ordinance purporting to change pension provisions from those incorporated in the existing collective bargaining agreement was held to be a breach of contract. Ordinance 1107 works a similar change from the terms of an existing contract. It appears extremely likely that Ordinance 1107 will be found to breach the current contract between the union and the city. An ordinance by which a city breaches a valid contract obviously impairs the obligation of contract and so violates the literal language of article I, §17 of the Constitution. Of course, mere statutory authorization cannot overcome a constitutional prohibition, and the city has advanced no argument apart from the Act 205 authorization that would bring the ordinance at issue here within a recognized exception to the literal language of the Contracts Clause.

-------

[11] 53 P.S. §895.602(d).

The cases interpreting the power of legislative bodies to alter the terms of a public employee retirement system with regard to vested employees, non-vested employees and persons not yet employed have no applicability to the present case. *See, e.g., Association of Pennsylvania State College and University Faculties v. State System of Higher Education,* 505 Pa. 369, 479 A.2d 962 (1984); *Catania v. Commonwealth (Catania II),* 71 Pa. Commonwealth Ct. 393, 455 A.2d 1250 (1983). Those cases sought to define the contract rights of the individual employee relative to the public employer *in the absence of a collective bargaining agreement establishing such rights.* Here, pension provisions are incorporated in a collective bargaining agreement, and the basic issue in this dispute is what power a municipality has, if any, to alter contract rights under such an agreement unilaterally.

The final basis on which the city argues that the preliminary injunction should not have been granted is that the public interest will be affected adversely by the injunction. The city relies primarily on *Leonard v. Thornburgh,* 75 Pa. Commonwealth Ct. 553, 463 A.2d 77 (1983), a case brought in this court's original jurisdiction, in which taxpayers of the City of Philadelphia sought, among other things, a preliminary injunction against the city to prevent it from collecting wage taxes at different rates for residents and nonresidents and a preliminary injunction against the Commonwealth to prevent it from implementing or enforcing the statutory provision pursuant to which the disputed city tax ordinances had been enacted. This court agreed with the petitioner-taxpayers that they were likely to succeed on the merits. Nevertheless, the court denied their application "with regret" after finding that the enjoining of the collection of the current wage tax would propel the city into a state of financial paralysis, because it would cre-

ate a $60 million deficit, and the city's home rule charter forbade the city controller to approve any expenditures until the budget was balanced.

As mentioned above, Chapter 3 of Act 205 establishes mandatory actuarial funding standards for municipal pension systems. According to the testimony of Albert Pike, actuary for the Philadelphia Board of Pensions and Retirement, the funding standard applicable to the city under Chapter 3 would require the city to make "level dollar amortization payments" on the pension system's unfunded liability, that is, to pay an equal amount each year over which this unfunded liability was amortized. Mr. Pike calculated that such a payment would have been $177 million.

The method previously used by the city to calculate its annual payment on the unfunded liability was known as level percentage applied against payroll. By that method, the city's payments increased yearly by the same percentage as the increase in the total payroll. Mr. Pike testified that, using the level percentage method, the city actually paid $95,267,000 toward the unfunded liability for the current fiscal year—a difference of approximately $82 million. The city was able to make its current payment as calculated by the old method because one of the optional remedies available to participants in Level III of the recovery program is delayed implementation of the funding standards mandated in Chapter 3. *See* sections 606(a)(4),[12] 607(g),[13] *and* 607 (h).[14]

Carl Gambetta, the city's Director of Finance, testified that in addition to the difference in unfunded liability payments, the city would lose $27 million to $30 mil-

---

[12] 53 P.S. §895.606(a)(4).
[13] 53 P.S. §895.607(g).
[14] 53 P.S. §895.607(h).

lion in supplemental state assistance available to partici-
pants in Level III of the recovery program if the city
were disqualified from participation in the program. *See*
sections 607(j)[15] *and* 608.[16]

The city contends that the loss of this money would
have a substantial adverse effect on the city's finances
and hence on the public interest. The city has not ar-
gued here, as it did in *Leonard v. Thornburgh,* that the
loss of this money would result in immediate financial
paralysis.

Judge MAIER stated in his opinion that the city had
presented no *evidence* in the form of letters, testimony,
or otherwise that would enable him to make the factual
determination that the city would not be permitted to
participate in the recovery program by virtue of the is-
suance of the injunction. Because of this lack of proof of
harm to the city, and hence to the public interest, the
judge stated that he could not conclude that greater
harm would be caused by granting the injunction than
by denying it. As noted above, the order the judge is-
sued retained jurisdiction over the matter, and it ex-
pressly stated that the injunction might be dissolved
upon a showing by the city that the continued en-
forcement of the injunction is otherwise more harmful
than a grant of dissolution. The opinion stated that this
provision of the order adequately guarded the public in-
terest.

To repeat, the issue facing us is whether there were
any apparently reasonable grounds for the action of the
court. In Judge MAIER's view, the issue of harm to the
public interest had not yet been squarely presented to
him. Although section 606(b) of Act 205 does make the
"establishment" of a revised benefit plan mandatory for

---

[15] 53 P.S. §895.607(j).

[16] 53 P.S. §895.608.

participants in Level III, the judge concluded that the city had not demonstrated that his issuance of the preliminary injunction requested by the union necessarily would bar the city from participation in the program. In reaching that conclusion, the judge necessarily was aware that one of the exhibits offered by the city at the hearing was a letter from the Executive Director of the Public Employee Retirement Study Commission to the Finance Director of the city, authorizing the city to participate in Level III of the recovery program for 1986, and indicating that the commission would contact the city later concerning compliance with any mandatory provisions of the act. However, under the circumstances of this case, the city's plausible position can be that the city had *complied* with the mandatory provision of establishing a revised benefit plan, and the fact that enforcement of the plan was later barred by a court was a matter beyond the city's control that should not be regarded as a reason for ending the city's participation in Level III. Furthermore, because the order issued by Judge MAIER enjoined enforcement of Ordinance 1107 only as it pertained to the members of District Council 33, the city would remain in compliance with regard to other employees.

These possibilities suggest that the issuance of the preliminary injunction is not at all certain to have the effect claimed by the city. In *Leonard v. Thornburgh* the effect on the public interest of the preliminary injunction preventing the city from collecting tax revenues was clear and immediate and potentially disastrous. In this case, Judge MAIER has found that the effect of his order is far more doubtful. The judge has not disregarded the issue of harm to the public interest; rather, he has stated that he requires better proof of harm before he will allow that consideration to outweigh all the other reasons he found for granting the injunction. The

order he issued expressly stated that the preliminary injunction might be dissolved upon a showing of such harm.

Thus, the court's handling of this difficult problem did not lack apparently reasonable grounds. Therefore, we affirm.

ORDER

NOW, December 18, 1987, the order of the Court of Common Pleas of Philadelphia County, dated March 6, 1987, No. 2118, January Term, 1987, is affirmed.