667 A.2d 5

**SCHOOL DISTRICT OF WILKINSBURG and Board of School Directors of the School District of Wilkinsburg, Appellants,**

v.

**WILKINSBURG EDUCATION ASSOCIATION, Pennsylvania State Education Association/National Education Association, Anne McLemore, George Edwards, Denise Edwards and Michael Evans, Appellees.**

Supreme Court of Pennsylvania.

Argued Sept. 18, 1995.

Decided Oct. 27, 1995.

Reargument Denied Dec. 12, 1995.

336

Edwin J. Strassburger, H. Yale Gutnick, Pittsburgh, for appellants.

James M. Sheehan, amicus curiae for Eugene W. Hickok, Secretary of Education.

Michael I. Levin, amicus curiae for PA School Boards Assn.

Ronald N. Watzman, for Wilkinsburg Education Association & Pennsylvania State Education Association/National Education Association.

Daniel R. Delaney, for Anne McLemore, George Edwards, Denise Edwards & Michael Evans.

W. Thomas McGough, for Alternative Public Schools, Inc.

Before NIX, C.J., and FLAHERTY, ZAPPALA, CAPPY, CASTILLE and MONTEMURO, JJ.

## OPINION OF THE COURT

FLAHERTY [1], Justice.

On March 28, 1995, the Wilkinsburg Education Association et al. (hereinafter "the union") filed a complaint in equity and a motion for preliminary injunction in the Court of Common Pleas of Allegheny County. The union sought to prevent the Wilkinsburg School Board from entering into a contract with Alternative Public Schools, Inc. (APS) for operation and management of Turner School. Argument on this complaint was conducted the next day, and was limited to legal argument only. The board objected to proceeding without an evidentiary hearing, but the chancellor determined that a hearing was not necessary because only matters of law were at issue. The controlling statute was the Public School Code of 1949, 24 P.S. § 1–101 et seq.

On March 30, 1995, the chancellor preliminarily enjoined the board from entering into a contract with APS for the operation of Turner School.[2] The chancellor held that if the School

1. This case was reassigned to this writer on September 29, 1995.

2. In *New Castle Orthopedic Assoc. v. Burns* this court stated that the prerequisites for issuing a preliminary injunction are:

Code authorized the board to enter into a contract with a private corporation to operate one of its schools, there was no need for an evidentiary hearing, for courts will not ordinarily review the wisdom of the board's policy decisions; and if there was no authority to enter such a contract, there was likewise no need for an evidentiary hearing, for without statutory authority, the reasons for the board's actions were immaterial. The chancellor also determined that the harm alleged was both immediate and irreparable, particularly harm to the plaintiff-taxpayers, who might not be able to recover any monies paid to the corporation, and that there is no provision of the School Code which authorizes a school district to enter into a contract with a private entity for the education of children who live in the district. The chancellor also found that an injunction would preserve the status quo and that the union was likely to prevail on the merits. Based on these findings, the chancellor issued a preliminary injunction and ordered that any appeal would not act as an automatic supersedeas.[3]

The board appealed to Commonwealth Court and applied for reinstatement of the supersedeas. On May 5, 1995, Judge Kelton, of Commonwealth Court, reinstated the automatic supersedeas which had been removed by the chancellor, based on his view that it was error to grant the preliminary injunction without holding a hearing, particularly on the issue of

> first, that it is necessary to prevent immediate and irreparable harm which could not be compensated by damages; second, that greater injury would result by refusing it than by granting it; and third, that it properly restores the parties to their status as it existed immediately prior to the alleged wrongful conduct.... Even more essential however, is the determination that the activity sought to be restrained is actionable, and that the injunction issued is reasonably suited to abate such activity. And unless the plaintiff's right is clear and the wrong is manifest, a preliminary injunction will not generally be awarded.
>
> 481 Pa. 460, 464, 392 A.2d 1383, 1385 (1978), quoting *John Bryant Co. v. Sling Testing and Repair*, 471 Pa. 1, 369 A.2d 1164 (1977).

**3.** On March 30, 1995, after the court suggested that irreparable harm to taxpayers was more clear than harm to the union, the union also presented a motion for joinder of plaintiffs. The board did not oppose the motion, and four taxpayers were joined as plaintiffs. On May 15, 1995, APS was joined as a defendant.

irreparable harm. Judge Kelton also noted, but did not decide, that Section 1124 of the School Code, which grants the board certain powers, was claimed by the board as authority for its acts, thus raising an issue as to whether the chancellor was correct in finding that the School Code did not authorize the board's acts.

On July 17, 1995, a three-judge panel of Commonwealth Court, with one judge dissenting, affirmed the chancellor's preliminary injunction. Commonwealth Court's affirmance was based on the view that no evidentiary hearing was required since all material facts were undisputed, and that immediate and irreparable harm could be determined from the fact of the proposed contract. Additionally, Commonwealth Court stated that the chancellor need not rule on the merits of the controversy at the preliminary injunction stage, but only that the claim raises substantial legal questions. Moreover, Commonwealth Court held that the public interest was defined by the School Code, which requires that the board not take any action not authorized by the School Code. The court's order affirmed the chancellor's original order.[4] The board filed an application for reconsideration on July 19, 1995. The application for reconsideration was denied on August 14, 1995.

Briefs before us describe additional events which transpired as the legal proceedings progressed. On June 5, 1995, the board entered into an agreement with APS for the operation of Turner School; on July 25, 1995 the board received approval from the Secretary of Education for an alteration of its education plan to allow implementation of the contract with APS; the board made payments to APS pursuant to the agreement; and on August 1, 1995 the board notified twenty-four teachers that they had been furloughed.

On July 26, 1995, the union filed a motion for contempt, and on August 14, 1995, Commonwealth Court denied the petition for reconsideration. On August 24, 1995, the chancellor found the board to be in contempt.

---

4. The dissenting judge would have vacated the preliminary injunction because an evidentiary hearing was not conducted, although the board's counsel asked for one no fewer than fourteen times.

On August 18, 1995 the board petitioned for allowance of appeal, and on August 22, 1995 the board filed an emergency petition to assume plenary jurisdiction. On August 24, 1995 this court granted both the allocatur and the petition to assume plenary jurisdiction, excluding any contempt proceedings before the Court of Common Pleas of Allegheny County. On the same day, the chancellor found the board in contempt and ordered that certain actions be taken no later than August 28, 1995. In response to a supplemental emergency petition to assume plenary jurisdiction, this court then stayed all contempt proceedings.

■ The board raises three primary arguments on appeal. First, it claims that it was error to enter the preliminary injunction on the grounds, inter alia, that a hearing was necessary before an injunction could be issued. Our standard of review in the issuance of a preliminary injunction is as follows:

> Unless there were "apparently reasonable grounds" for the trial court to believe that it was presented with a situation of "urgent necessity", it should not have issued the preliminary injunction. The two most important factors to be taken into account in this determination are first, whether an immediate and irreparable harm is actually threatened, and second, whether greater harm is caused by issuing the injunction than by refusing it. This limitation on the hearing court's exercise of its equitable powers is warranted because the relief is being sought prior to a final determination of the merits of the case and without a complete development of all of the facts upon which a final judgment will depend.

*New Castle Orthopedic Assoc. v. Burns,* 481 Pa. at 464–65, 392 A.2d at 1385. Commonwealth Court has stated, additionally, that "where an adverse effect upon the public interest will result from granting a preliminary injunction, it should not be granted. *Philadelphia v. District Council 33,* 112 Pa.Cmwlth 90, 535 A.2d 231 (1987), aff'd 528 Pa. 355, 598 A.2d 256 (1991). Because we do not believe that the record in this case estab-

lishes either irreparable harm or that issuing the preliminary injunction avoided greater harm than refusing it, or that there may not be an adverse effect upon the public interest,[5] we agree with the board that the injunction should not have been issued.[6] Accordingly, Commonwealth Court is reversed and the injunction is dissolved.[7]

■ On the merits of the underlying claim, the board asserts that the lower courts were in error in determining that the Public School Code does not authorize the contract with APS; and second, that the Public School Code is unconstitutional as applied to Wilkinsburg if the APS contract is illegal. Although our jurisprudence normally requires that we address questions of law before constitutional questions, in this case we deem it appropriate to address the constitutional question first, and for that reason, we do not reach the argument as to the Public School Code.

Article III, Section 14 of the Pennsylvania Constitution provides:

5. In requesting an evidentiary hearing, counsel for the board stated:
   *Counsel.* Material facts are in dispute.
   *Court.* What material fact is in dispute?
   *Counsel.* Irreparable harm is a factual argument, public interest is a factual argument. They absolutely are, your honor, they are not legal arguments, they are factual arguments.

6. An evidentiary hearing on the issue of irreparable harm, the effect of the injunction, and the possible harm to the public interest would have permitted the board to introduce evidence of the reasons for its action, including the circumstances in which it acted, and that would, presumably have led the parties and the lower court to consider the possible conflict between its interpretation of the School Code and Article III, Section 14 of the Pennsylvania Constitution.

7. See 5 Goodrich Amram 2d, § 1531(a)(6):
   There is no absolute duty on the court to grant an evidentiary hearing on an application for a preliminary injunction. It is a matter for the discretion of the trial court. However, it is equally true that a decision whether to hold a hearing will be reversed where that discretion is abused. Moreover, the rules and case law clearly indicate that a hearing is customarily held and is a preferred procedure. It is a rare preliminary injunction that can correctly be denied without a hearing *and no preliminary injunction can be granted and continued without a hearing whether before or after the initial grant.* (Emphasis added).

> The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth.

According to ·the board, should the Public School Code be interpreted to prohibit the subcontracting of teacher services, the code would be unconstitutional, for the code would prohibit the constitutionally required "thorough and efficient system of public education" in the circumstances faced by the board in Wilkinsburg. Among the circumstances which the board alleges that it would prove, given an opportunity, are the following:

1. The 1992 high school valedictorian in the Wilkinsburg School District had a grade point average of 2.667 (out of 4.0). Of the 1995 graduating class, the two highest averages were 3.125 and 3.0 and the third was 2.684.

2. Of forty students who took the Scholastic Aptitude Test between June of 1993 and June of 1994, which has a scale of 400 to 1600 (maximum), only one scored above the national average (950) on the combined math and verbal portions of the examination. The Wilkinsburg average was below 690.

3. In April, 1993, Turner School fourth, fifth and sixth graders were among students from more than 200 Pennsylvania elementary schools to take achievement tests in reading, math, language and science. Only one-third of Turner's students scored above the national average in all subjects, compared to approximately two-thirds statewide—the worst performance in Allegheny County.

4. Pennsylvania's Secretary of Education has approved Wilkinsburg's proposed contract with APS and the secretary stated: "The school district's statistics demonstrate that children are not receiving a quality education, and I share the District's concern that major change within the District is necessary to meet the needs of students and parents."

These and other facts would show, according to the board, that if the Public School Code prohibits the board's subcontracting teachers, the code is unconstitutional because it would prohibit

the board from providing a "thorough and efficient" education for Wilkinsburg children.

We recognize, as Mr. Justice Frankfurter observed, that "A statute may be ... valid under one state of facts but not another, ... it may be valid as to one class of persons and invalid as to others...." *Staub v. City of Baxley*, 355 U.S. 313, 330, 78 S.Ct. 277, 286, 2 L.Ed.2d 302 (1958) (dissenting opinion). Here, it is conceivable that even if the Public School Code were to be interpreted to prohibit subcontracting of teachers, and that interpretation were to pass constitutional muster under most conditions, there may be other conditions, which the school district here insists there are, which would render this application of the Public School Code unconstitutional. We agree.

■ In reviewing the proceedings in this case, it is apparent that some salient principles have escaped notice. First, public education in Pennsylvania is a fundamental right. It is required by Article III, Section 14 of the Pennsylvania Constitution. Second, this court has consistently examined problems related to schools in the context of that fundamental right. In *School District of Philadelphia v. Twer*, 498 Pa. 429, 435, 447 A.2d 222, 224–25 (1982), for example, Mr. Justice Nix, now Chief Justice, wrote:

> [T]he maintenance of a public school system is primarily for the education and training of our youth and the incidental financial benefit of those participating therein is of secondary concern.... The polestar in any decision requiring the assignment of priorities of resources available for education must be the best interest of the student.... [A]ny interpretation of legislative pronouncements relating to the public educational system must be reviewed in context with the General Assembly's responsibility to provide for a "thorough and efficient system" for the benefit of our youth.

(Citations omitted). In sum, on remand, the best interest of the children is the polestar.

■ Accordingly, we remand this case for the holding of evidentiary hearings. The preliminary injunction and all ancillary contempt proceedings are vacated as indicated above.[8]

Vacated and remanded.

ZAPPALA, CASTILLE and MONTEMURO, JJ., join in this opinion.

ZAPPALA, J., files a concurring opinion joined by FLAHERTY, CASTILLE and MONTEMURO, JJ.

NIX, C.J., files a dissenting opinion which is joined by CAPPY, J.

MONTEMURO, J., is sitting by designation.

ZAPPALA, Justice, concurring.

"The fundamental public policy, expressed in the Constitution and underlying school laws, is to obtain a better education for the children of the Commonwealth." *Appeal of Walker*, 332 Pa. 488, 491, 2 A.2d 770, 772 (1938). "[T]he maintenance of a public school system is primarily for the education and training of our youth and the incidental financial benefit of those participating therein is of secondary concern." *School District of Philadelphia v. Twer*, 498 Pa. 429, 435, 447 A.2d 222, 224 (1982). "Any interpretation of legislative pronouncements relating to the public educational system must be reviewed in context with the General Assembly's responsibility to provide for a 'thorough and efficient system' for the benefit of our youth." *Id.*, 447 A.2d at 225.

Proceeding from these premises, we held in *Twer* that although the School Code might generally require an individu-

___

8. The union claims that the constitutional issue raised by the board has been waived because it was not raised below. We disagree. This matter arose in the context of a preliminary injunction. There was neither adequate time nor an adequate opportunity during a hearing to raise the issue. See *Cagnoli v. Bonnell*, 531 Pa. 199, 611 A.2d 1194 (1992) (Where there is neither notice nor opportunity to research and prepare cogent legal arguments, strict compliance with the rule that matters not raised before the trial court will not be considered on appeal will not be applied).

alized hearing prior to demotion, such would not be insisted on "where its application would defeat the primary purposes of the Code." *Id.* at 438, 447 A.2d at 226. We determined that in light of the extremely dire financial circumstances under which the school district acted, it was error to require a full predemotion hearing as this "unnecessarily and unwarrantedly circumscribed the discretion of the Board in its good faith effort to discharge its responsibilities." *Id.* at 439, 447 A.2d at 227.

To be sure, we have also recognized that it is not the role of the judiciary to "inquire into the reason, wisdom or expediency of the legislative policy with regard to education." *Teachers' Tenure Act Cases,* 329 Pa. 213, 224, 197 A. 344, 352 (1938). See generally, *Reichley by Wall v. North Penn School District,* 533 Pa. 519, 626 A.2d 123 (1993). "The Constitution ... has placed the educational system in the hands of the legislature, free from any interference by the judiciary *save as required by constitutional limitations." Ehret v. School District of Borough of Kulpmont,* 333 Pa. 518, 522, 5 A.2d 188, 190 (1939) (emphasis added). Thus, the legislation that the General Assembly has enacted, being the implementation of the constitutional mandate of Article III, Section 14, is to be interpreted consistent with that mandate and cannot be applied in such a manner as would defeat the purpose of it.

The dissent highlights numerous individual sections of the School Code to support its conclusion that the Code does not authorize the Board's actions. As we noted in *Ehret,* however, "[t]he separate sections of the School Code all derive their inspiration from this source [i.e., the fundamental public policy of obtaining a better education for the children of the Commonwealth]. Though containing individual policies in themselves, each is subordinate to this cardinal purpose." 333 Pa. at 522, 5 A.2d at 190.

The appellants suggest that under the circumstances here present, the Public School Code must be interpreted to allow the actions undertaken by the board "in its good faith effort to discharge its responsibilities," otherwise the very purposes of the Code and the constitutional mandate it follows would be

defeated. I believe the validity of this assertion can only be tested by allowing them the opportunity to develop a record in support of their arguments. In doing so we do not depart from the usual order of analysis, under which constitutional questions are avoided if a case may be decided on non-constitutional grounds, because we do not "address," as such, the constitutional issue presented. Rather, we determine only that the appellants have not had a full and fair opportunity to develop their case, as to either the constitutional or the statutory issue.

In my view, the common pleas court committed a manifest abuse of discretion in issuing the preliminary injunction without holding a hearing. The effect of the improper issuance of a preliminary injunction, however, was corrected by the further proceedings in this Court, and the question remains whether the plaintiffs/appellees are entitled to permanent relief on any of the grounds asserted in their Complaint. For the reasons stated, I join in the Order vacating the orders below and remanding for evidentiary hearings.

FLAHERTY, CASTILLE and MONTEMURO *, JJ., join this concurring opinion.

NIX, Chief Justice, dissenting.

I respectfully dissent. Although the majority is apparently guided by the laudable intention of ensuring that the children of the Turner School receive an educational opportunity equal to that of their peers in other parts of the Commonwealth, I must nevertheless disassociate myself from the reasoning and result of the majority opinion.

The threshold question in this case is whether the Board of School Directors of the School District of Wilkinsburg ("Board") is authorized by the Public School Code, 24 P.S. § 1–101 *et seq.*, to enter into a contract with a private company to manage one of its schools. Because I believe that the Public School Code does not grant such authority, I would affirm the Commonwealth Court.

* MONTEMURO, J., is sitting by designation.

The majority first concludes that the preliminary injunction should not have been issued because the record does not establish the grounds upon which an injunction would properly be issued. The insufficiency of the record is attributed to the chancellor's failure to hold an evidentiary hearing in connection with the issuance of the injunction. However, in passing upon the correctness of the chancellor's decision, the majority ignores the fact that the Board has already entered into a contract with Alternative Public Schools, Inc. ("APS"), and further, that APS is currently managing the Turner School. Assuming *arguendo* that the chancellor erred in failing to grant an evidentiary hearing, I believe that this question is moot in view of the events that have transpired since the issuance of the preliminary injunction.

Although this Court assumed plenary jurisdiction of this case, the majority has failed to seize the opportunity to resolve the underlying legal question of whether the Board has the authority to contract with APS under the Public School Code. Consequently, the majority's remand of this case not only forecloses a prompt determination of the legal question presented but also impedes the ultimate resolution of this case.

Additionally, I strongly disagree with the basis upon which the majority has directed the trial court to reexamine this case on remand. The majority correctly states that "our jurisprudence normally requires that we address questions of law before constitutional questions ...," but then inexplicably disregards this principle in order to conclude that the Public School Code would be unconstitutional if the Board proves those facts which it has alleged in its brief to this Court. The majority understandably does not advance any identifiable reason for deviating from the correct analytical framework because its direction to the trial court is clearly inconsistent with well-established legal principles.

A school district is a creature of the legislature and therefore has only those powers that are granted to it by statute. 24 P.S. § 2–211; *Chartiers Valley Joint Schools v. County Bd. of School Directors of Allegheny County*, 418 Pa. 520, 211 A.2d 487 (1965). A review of the Public School Code reveals

numerous instances where the General Assembly has explicitly authorized the use of private contractors to provide educational and student-related services: 24 P.S. § 5–504(a) ("The board of school directors in any school district shall have the power to ... contract for any services necessary for the operation of a food service program...."); 24 P.S. § 5–523(e) ("[B]oards of school directors of any school district ... may contract for educational broadcasts for children or adults...."); 24 P.S. § 9–964.1(a) ("[L]ocal school districts shall have the power to contract with private residential rehabilitative institutions for educational services to be provided to children as part of any rehabilitative program required in conjunction with the placement of a child in any such institution...."); 24 P.S. § 13–1362 ("The free transportation of pupils ... may be furnished by using ... private conveyances ... or other common carriers...."); 24 P.S. § 13–1376(c) (relating to costs of tuition and maintenance of certain exceptional children for which approved private schools may be reimbursed); 24 P.S. § 14–1410 ("For special examinations recommended by school physicians, school districts ... may engage the services of ophthalmologists or other licensed medical specialists or of optometrists."); 24 P.S. § 15–1547(a)(2) ("School districts may utilize any appropriate ... private materials, personnel and other resources in developing and implementing [an alcohol, chemical and tobacco instructional abuse program]."); 24 P.S. § 24–2401(4) ("Any school district of the second, third, or fourth class and any joint school board may employ an independent auditor who shall be a certified public accountant or competent public accountant...."); 24 P.S. § 24–2409 ("In all school districts where the accounts are audited by borough or township auditors, the auditors may employ an attorney whenever the same is deemed advisable.").

The foregoing examples clearly illustrate that the General Assembly has contemplated and provided for specific situations where a school board or school district may enter into a contract with a private entity to provide services for the efficient administration of public education. These references

to a school board's authority to contract make it clear that the General Assembly intended to delegate this power only in those instances where it expressly indicated. The Board contends that the Public School Code confers the power to enter into the contract with APS by necessary implication. However, in view of the manner in which the General Assembly has conferred the power to contract with private entities in the various sections of the Public School Code, I do not believe that the Board has the power to enter into a contract with APS. Moreover, it is the Board that must come forward with some specific provision of the Public School Code which, by *necessary* implication, allows the Board to enter into the contract with APS. It is my belief that there are no such provisions in the Public School Code. While the Board suggests that there exist general rights that include the right to privatize the responsibilities bestowed upon them by the General Assembly, this suggestion is unsupported by the Public School Code.

Specifically, the Board argues that several sections of the Public School Code impliedly authorize the Board to enter into the contract with APS. The Board points to 24 P.S. § 2–211 (which vests school districts with "all necessary powers to enable them to carry out the provisions of [the Public School Code]."); 24 P.S. § 5–501 (which requires that school districts "shall establish, equip, furnish, and maintain a sufficient number of elementary public schools...."); 24 P.S. § 5–502 (which allows school districts to "establish, equip, furnish, and maintain ... additional schools or departments for the education and recreation of persons residing in [the] district...."); and 24 P.S. § 11–1124(2) (which allows school districts to suspend employees as a result of the "[c]urtailment or alteration of the educational program....").

I am nevertheless unpersuaded that any of these sections, or any other sections in the Public School Code, authorize the Board to enter into the contract with APS by necessary implication. These sections simply do not meet the Board's assertions. In addition, 24 P.S. § 11–1106 undercuts the Board's position that its responsibility to manage the Turner

School can be delegated by necessary implication. That section provides that "[t]he *board of school directors* in every school district *shall employ* the necessary qualified professional employees, substitutes and temporary professional employes to keep the public schools open in their respective districts in compliance with the provisions of [the Public School Code]." 24 P.S. § 11–1106 (emphasis added). In my view, this section expressly places the duty to hire teachers on the school board and negates any inference to the contrary. Thus, not only has the Board failed to offer some provision of the Public School Code which confers upon the Board the power to enter into the contract with APS by necessary implication, there is support in the Public School Code for the opposite conclusion.

By proceeding to address an issue of purportedly constitutional dimension,[1] the majority conveniently fails to offer any explanation as to how the Board possesses the authority to contractually delegate its obligation to manage the Turner School to a private company. The factual illustrations cited by the majority clearly portray a school district in a state of crisis. I emphatically share the majority's concern for the welfare of the children that must endure a system which yields such ghastly results. I am nevertheless constrained to conclude that without an express grant of authority from the General Assembly, the Board can not contract with APS for the management of the Turner School.[2]

CAPPY, J., joins in this dissenting opinion.

1. Based on my conclusion that the Public School Code does not authorize the Board to contract with APS, there is no need to address the constitutional issue raised by the majority. However, I find the majority's reasoning on this point to be specious and wholly unpersuasive.

2. The majority's decision today also raises substantial questions concerning the frustration of the statutory scheme as it applies to the tenure provisions of the Public School Code, 24 P.S. § 11–1121 *et seq*, an issue which the chancellor may have to address upon remand. As employees of a private company, the teachers of APS could conceivably be considered "at-will" employees who would not have the protections against wrongful discharge that the legislature clearly intended to provide.